FILED

2015 Sep-28  PM 03:24
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| XINGZHONG SHI, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case Number: 5:13-cv-00327-JHE |
| | ) | |
| ALABAMA A&M UNIVERSITY, et al. | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## MEMORANDUM OPINION[1]

Plaintiff Xingzhong Shi brings this action for constitutional violations under 28 U.S.C. § 1983 and for race and national origin discrimination under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*  (Doc. 7).  He brings these claims against his former employer, the Board of Trustees ("the Board") of Alabama A&M University ("the University"); Dr. Trent Montgomery, Dean of the University's School of Engineering and Technology during Shi's employment; Dr. Daniel Wims, the University's Provost and Vice President for Academic Affairs; and Dr. Andrew Hugine, Jr., President of the University.  (*Id.*). The parties have filed cross-motions for summary judgment on Shi's claims.  (Docs. 101 & 109). Defendants have also moved to strike Shi's allegedly unsupported allegations and unauthenticated evidentiary submissions in his motion and opposition.  (Doc. 115).[2]  The

---

[1] In accordance with the provisions of 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73, the parties have voluntarily consented to have a United States Magistrate Judge conduct any and all proceedings, including trial and the entry of final judgment.  (Doc. 46).

[2] Defendants also moved to strike Shi's original dispositive motion, (doc. 100), titled "Plaintiff's Dispositive Motions with Rebuttal to Defendants' Response to Plaintiff's Interrogatories in Place of Deposition."  (Doc. 104).  Because Shi's motion to amend his dispositive motions was granted, (doc. 106), and the original dispositive motion replaced by "Plaintiff's Motion for Summary Judgment," raising the same arguments, (doc. 109),

motions are fully briefed and ripe for review.  (Docs. 100-104, 109, & 111-118).[3]  For the reasons stated below, Defendants' motion for summary judgment is **GRANTED**, and Shi's motion for summary judgment is **DENIED**.

## I. Standard of Review

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  "Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 447 U.S. 317, 322 (1986).  The moving party bears the initial burden of proving the absence of a genuine issue of material fact.  *Id.* at 323.  The burden then shifts to the nonmoving party, who is required to "go beyond the pleadings" to establish that there is a "genuine issue for trial."  *Id.* at 324.  (citation and internal quotation marks omitted).  A dispute about a material fact is genuine "if the evidence is

---

Defendants' first motion to strike, (doc. 104), is **DENIED as MOOT**.

Defendants' second motion to strike, (doc. 115), is construed as objections to Shi's evidentiary submissions and will be addressed to the extent they are relevant to the evidentiary analysis below.  *See Campbell v. Shinseki*, 546 Fed. App'x 874, 879 (11th Cir. 2013) ("Before [the 2010] amendment, parties properly challenged evidence used in a summary judgment motion by filing a motion to strike.  The plain meaning of these [amended] provisions show that objecting to the admissibility of evidence supporting a summary judgment motion is now a part of summary judgment procedure, rather than a separate motion to be handled preliminarily.").  Any objections not specifically addressed below are deemed **MOOT** as irrelevant to determination of the pending motions.

[3] Shi's "Memorandum on Alabama A&M University Audit Findings," addressing an unrelated investigation into alleged financial improprieties at the University, does not appear to contain anything relevant to Shi's claims, and instead seems intended to undermine the credibility of Defendants.  (Doc. 118).  As courts may not make credibility determination on summary judgment, *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986), nothing in that document is relevant to the motions currently under consideration.  Therefore, it will not be considered.

such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The Court must construe the evidence and all reasonable inferences arising from it in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); *see also Anderson*, 477 U.S. at 255 (all justifiable inferences must be drawn in the non-moving party's favor). Any factual disputes will be resolved in Plaintiff's favor when sufficient competent evidence supports Plaintiff's version of the disputed facts. *See Pace v. Capobianco*, 283 F.3d 1275, 1276-78 (11th Cir. 2002) (a court is not required to resolve disputes in the non-moving party's favor when that party's version of the events is supported by insufficient evidence). However, "mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (per curiam) (citing *Bald Mtn. Park, Ltd. v. Oliver*, 836 F.2d 1560, 1563 (11th Cir. 1989)). Moreover, "[a] mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (citing *Anderson*, 477 U.S. at 252).

## II. Background

### A. Factual History[4]

#### i. Parties

Shi is a male, Asian citizen from China. (Doc. 103-1 at 62 (242-43); doc. 111 at 3 (not

---

[4] Shi makes many conclusory and unsupported statements of fact in his motion and response to Defendants' motion, (*see* docs. 109, 111 & 117); however, as these documents were not submitted under oath or under penalty of perjury, they are not evidence upon which facts supporting or opposing summary judgment may be based, *see* Fed. R. Civ. P. 56(c) and Adv. Comm. Notes, "Subdivision (c)" (2010 Amendments) (requiring either an affidavit or declaration under penalty of perjury). Accordingly, Defendants' objections to these statements of fact are **SUSTAINED**, and they will not be considered for purposes of summary judgment.

disputing these statements)).[5]   He began his employment with the University in fall of 2003, (doc. 103-1 at 29 (109)), but did not have an employment agreement with the University and was never tenured, (*id.* at 8 (28), 29 (112), 59 (231), & 61 (237)).

Montgomery was the Dean of the University's School of Engineering and Technology ("SET"), and, after a University-wide reorganization, the Dean of the College of Engineering, Technology and Physical Sciences ("CETPS").   (Doc. 103-12 at 2-3).   Hugine has been President of the University since July of 2009.   (Doc. 103-13 at 2).   Wims has been the University's Provost and Vice President for Academic Affairs since April 2010, "provid[ing] administrative oversight for the divisions of Academic Affairs and Research," which includes responsibilities over decisions related to hiring, tenure, and termination of faculty.   (Doc. 103-9 at 2-3).  The Board is the corporate body, created under Alabama law, *see* Ala. Code § 16-49-21, and with exclusive jurisdiction and powers to manage, supervise, control and set policy for the University, *see* Ala. Code §§ 16-49-21 to -24.

### ii.   University Policies in Effect During Shi's Employment

When Shi began employment with the University in fall of 2003, the Faculty/Administrative Staff Handbook, revised June 2003, ("the 2003 Handbook") set out the applicable policies and procedures for faculty members.   (Doc. 103-10 at 1-94).   Under Section 5.2 of the 2003 Handbook, "[n]on-tenure positions [were] by contract term-specific and for the most part temporary."   (*Id.* at 57).   Section 5.4 of the 2003 Handbook authorized University officials to suspend faculty members "with or without pay, depending upon the circumstances" if they "commit[ed] or participate[d] in acts of misconduct, or . . . represent[ed] a potential serious

---

[5]   All citations to the record refer to document and page numbers as assigned by the Court's electronic filing system.   Citations to depositions also include a parenthetical with the deposition page number(s).

danger to others, the University or themselves." (*Id.* at 59).

In addition to the 2003 Handbook, Procedure 5.1 set out standards for all University faculty, staff, and students when using the University network. (Doc. 103-9 at 4; doc. 103-10 at 95-98). Prohibited conduct included "Hacking or Spamming" and "Harassment." (Doc. 103-10 at 96-97). The former is described as "use [of] the University Network in a way that (a) disrupts, adversely impacts the security of, or interferes with the legitimate use of any computer, the University Network or any network that the University connects to, (b) interferes with the supervisory or accounting functions of any system owned or managed by the University, or (c) takes action that is likely to have such effects." (*Id.* at 96). The latter is described as "sending annoying, abusive, profane, threatening, defamatory or offensive messages." (*Id.* at 97).

On September 16, 2011, a new version of the handbook ("the 2011 Handbook") became effective, superseding all prior handbooks. (Doc. 103-9 at 5; doc. 103-11 at 1-152). Section 3.2.1.3 of the 2011 Handbook discusses non-tenure track appointments, stating:

> Non-tenure track faculty are not eligible for tenure, but are eligible for promotion. Non-tenured faculty members are at-will employees of the University who may be terminated upon three (3) weeks prior notice. The term, if any, of a non-tenured faculty member will be stipulated in an Official Offer of Employment Notification or Appointment Letter and may be for any period of time.

(Doc. 103-11 at 40). Regarding non-tenured faculty separation, section 6.2.1 of the 2011 Handbook stated:

> The University has no obligation to reappoint a non-tenured faculty member to any position or to continue that person's employment when the term of appointment expires. A term is defined as one semester, unless otherwise specified in writing. The decision whether to reappoint a non-tenured faculty member when the term of appointment expires may be based on any factor considered relevant to the total institutional interests. The University may employ a member of the faculty at the beginning of a term without commitment to employment or payment throughout the semester in question of for the entire academic year.

(*Id.* at 111).

### iii.  Shi's Removal from Tenure-Track Appointment List

In the Spring 2007 semester, the University's faculty search committee recommended Shi for a tenure-track appointment, but Montgomery replaced his name with an African-American female candidate, who had a Ph.D. in computer science.  (Doc. 103-1 at 25 (95-96)).  Shi acknowledged at his deposition that Montgomery did not replace his name on the list because of his national origin but because of Shi's lack of a Ph.D.  (*Id.* at 25-26 (95-97)).[6]  He did not file a grievance or other complaint.  (*Id.* at 24 (91)).

### iv.  Atluri Appointment to Interim Chair in 2010

In late 2010, Montgomery appointed Dr. Venkata Atluri as the Interim Chair of the Department of Computer Science ("the DCS").  (Doc. 7 at 5; doc. 103-12 at 4).  Atluri was a tenured Associate Professor from India with a Ph.D. in Zoology and a masters' degree in Computer Science.  (Doc. 103-1 at 21 (78) & 24 (92); doc. 109-1 at 15).  He had been employed at the University for at least ten years and had previously served as the Interim Chair of the DCS.  (Doc. 103-1 at 21 (78) & 31 (117-18)).  Shi alleges he and Dr. Jian Fu were discriminatorily not chosen for the appointment.  (Doc. 109 at 4).  At the time, Fu, who is from China, had a Ph.D. in Computer Science from the University of Alabama in Huntsville ("UAH") and several years of

---

[6] Shi contends in his opposition to summary judgment that the candidate Montgomery replaced him with was "not qualified" because she did not want to come to the University, (doc. 111 at 3-4); however, he does not cite any evidence in the record for these statements.  As a result, the Court will not accept them as true on summary judgment.  (*See* doc. 18 at 14-15 ("Any statements of fact that are disputed by the non-moving party must be followed by a specific reference to those portions of the evidentiary record upon which the dispute is based.  *All material facts set forth in the statement required of the moving party will be deemed to be admitted for summary judgment purposes unless controverted by the response of the party opposing summary judgment.*" (emphasis in original)); doc. 107-1).  *See also* Fed. R. Civ. P. 56(c) ("A party asserting that a fact . . . is genuinely disputed must support the assertion by:  (A) citing to particular parts of materials in the record . . . .").

hands-on industry experience.  (Doc. 109-1 at 15).  Shi was an Associate Professor from China, with a Ph.D. in Applied Math with minors in Computer Science and Atmospheric Science from UAH and nearly five years of hands-on industry experience.  (Doc. 109-1 at 16).

### v.   Wims and Hugine Reorganize the University's Schools in 2011

In 2011, Hugine authorized the reorganization of the University, changing, among other things, SET into CETPS.  (Doc. 103-1 at 10 (35-36); doc. 103-13 at 3).  Under Alabama law, the President is authorized to "regulate, alter, and modify the organization of the university, subject to review and concurrence of the board."  Ala. Code § 16-49-23.  Montgomery was the dean of SET before the reorganization and remained dean of CETPS afterward.  (Doc. 103-12 at 3).  The reorganization did not affect Shi's pay, benefits, department, office and teaching locations, curriculum, or time to arrive at and leave work.  (Doc. 103-1 at 34 (129-31)).

### vi.   Shi Placed on Administrative Leave with Pay in August of 2011 and His Employment Is Not Renewed in December of 2011

In spring of 2011, Shi began sending unsolicited emails to the individual defendants and various other University employees.  On January 27, 2011, Shi sent an unsolicited email to Montgomery, Wims, and Hugine and ten other faculty members, stating he had prepared a letter for Montgomery urging him to resign.  (Doc. 103-5 at 29).  Montgomery responded, instructing Shi to follow protocol and the chain of command.  (*Id.*).  On February 11, 2011, Shi sent another unsolicited email to the same people, attaching a letter urging Montgomery to resign as dean "by comparing and contrasting the [then] current Egyptian President Hosni Mubarak with [Montgomery]."  (*Id.* at 24-25).  Later that day, he sent another saying "Per cnn.com, 'Mubarak is gone, joy in Cairo streets.'  What about SET/AAMU?"  (*Id.* at 24).

On March 10, 2011, he sent an email to the three individual defendants, along with over sixty other University employees, comparing Montgomery to Hosni Mubarak and Muammar

Gaddafi.  (*Id.* at 23-24).  That same day, Montgomery responded to Shi (cc-ing Wims), stating Shi's emails had targeted him with "rambling, incoherent and untrue statements" and instructed Shi to "bring [his] concerns through the chain of command before sending out rambling emails" and to "cease these mischaracterizations."  (*Id.* at 21).  Shi responded with a series of emails to the individual defendants and dozens of other people, demanding Montgomery respond to each of Shi's allegations individually.  (*Id.* at 16-21).

In May 2011, in the auditorium after a meeting at which the reorganization plan was presented to the faculty, Wims spoke with Shi about switching to the math department because of Shi's Ph.D. in math.  (Doc. 103-1 at 19 (70)).  Montgomery and Hugine were present but did not participate in the conversation.  (*Id.* at 19 (70-71)).  Shi told Wims he had previously applied for a position in the math department but had not been selected.  (*Id.* at 20 (73)).

On June 30, 2011, at the end of an email addressed to dozens of people and reiterating Shi's allegations against Montgomery, Shi stated he "will keep fighting until either [he] will be removed from [the University] or the dean will be removed from his position."  (Doc. 103-5 at 14-15).  On July 27, 2011, he sent another email to the individual defendants and dozens of other people, referencing Gaddafi again and accusing Montgomery of "exercis[ing] [his] power on things that are against one of the most important US values – democracy."  (*Id.* at 12-13).  In an August 9, 2011 email to the individual defendants and dozens of others, Shi made the same accusation that Montgomery was a "dictatorial leader who **exercised his power in ways that are against one of the most important US values – democracy**, while USA have [sic] been spending many years spreading **democracy** to Iraq and other mideast countries and the rest of the world."  (*Id.* at 11-12).  Shi acknowledged at his deposition that comparing Montgomery to Gaddafi and Mubarak was unprofessional.  (Doc. 103-1 at 52 (203-04)).

On August 15, 2011, a college-wide CETPS meeting was held, during which Shi spoke at the beginning (during introductions) and at the end when Montgomery asked if there were questions. (*Id.* at 55 (215-16)). During the meeting, Shi stated Montgomery was "not a good dean," had "lied" about certain issues, and had "abused his power." (Doc. 102 at 14 (citing doc. 100 at 5); doc. 103-8 at 2; doc. 109 at 11).[7] Shi also demanded Montgomery's resignation "in an aggressive and angry manner." (Doc. 103-9 at 6; doc. 103-12 at 5).[8] Montgomery received complaints from faculty members who felt threatened by Shi's behavior and passed these on to Wims, who authorized Montgomery to put Shi on administrative leave with pay. (Doc. 103-9 at 6-7; doc. 103-12 at 5).[9] By a letter dated August 24, 2011, Montgomery notified Shi of the decision suspending him immediately. (Doc. 103-12 at 6 & 10).

Even after being put on leave with pay, Shi continued to send emails addressed to Wims, Hugine, and various other people throughout October and into November. (Doc. 103-5 at 31-37;

---

[7] Neither party cites evidence for this fact; however, as shown by the cited briefs and exhibits, the parties do not dispute these were the statements Shi made at the meeting. *See City of Atlanta v. United States*, 531 F. Supp. 506, 508 (N.D. Ga. 1982) ("The parties neglected to stipulate this fact, but it is implicit in their arguments."); *In re Hanson Dredging, Inc.*, 15 B.R. 79, 81 n.* (Bankr. S.D. Fla. 1981) ("These ultimate facts were asserted at trial or in the memoranda without dispute by any party and therefore there is an implied stipulation to these facts."); FED. R. CIV. P. 56 (allowing summary judgment where "there is no genuine dispute as to any material fact," requiring support for factual positions where a party is "asserting that a fact cannot be or is genuinely disputed," and allowing the court to "consider the fact undisputed" where it is not properly contested).

[8] Shi asserts these are merely the statements of a defendant and therefore "have no merits at all," (doc. 109 at 12); however, the sworn statements of a party are suitable evidence on summary judgment, *cf. Celotex Corp.*, 477 U.S. at 324 (noting a non-moving party must create a question of material fact on summary judgment "by *her own affidavits*" or other evidence) (emphasis added). Shi has not pointed to any admissible evidence inconsistent with the statements in Montgomery and Wims's affidavits.

[9] Shi asserts the 2003 Handbook (applicable at the time he was put on leave with pay) did not allow for "administrative leave" for employee misconduct, (doc. 111 at 19-20); however, it did allow for "suspension" with pay because of employee misconduct, (doc. 103-10 at 59). That it was incorrectly identified as "administrative leave" instead of "suspension" does not change the fact the 2003 Handbook provided for the discipline imposed on him.

doc. 109-8).  At least one of these emails continued to refer to Montgomery as a dictator who abused his power.  (Doc. 103-5 at 32; doc. 109-8 at 4).[10]

Citing Shi's unsolicited emails and his conduct at the August 15, 2011 college-wide meeting, the University did not renew Shi's employment for the Spring 2012 semester, notifying Shi in writing by letter, dated December 13, 2011.  (Doc. 103-9 at 7; doc. 103-11 at 154).

## B.  Procedural History

On March 23, 2012, Shi filed a charge with the United States Equal Employment Opportunity Commission ("EEOC"), alleging the University discriminated against him on the basis of his race and national origin by placing him on administrative leave with pay and later terminating his employment.  (Doc. 1-1 at 12).  Shi instituted this action on February 19, 2013, against Defendants Montgomery, Wims, Hugine, and the University's Grievance Committee.  (Doc. 1).

On April 15, 2013, Shi, at the direction of the Court, amended his complaint, asserting five claims under Title VII and § 1983.  (Doc. 7 at 4-11).  The four defendants moved to dismiss the claims, (docs. 15 & 16), and Shi responded, (docs. 20-22).  The Court construed Shi's response as a motion for leave to amend his amended complaint to include an additional claim and new defendant, the Board of Trustees of the University.  (Doc. 28 at 2).  The Court also granted in part and denied in part the original parties' motion to dismiss.  (*Id.*).  Specifically, finding that the Grievance Committee and Board of Trustees were entitled to Eleventh Amendment immunity, the Court dismissed the § 1983 claims against them (including Count 3, the only claim asserted against the Grievance Committee) and any official capacity claims

---

[10] Defendants object to these emails as unauthenticated.  (Doc. 115 at 19-20).  However, these same emails are part of Exhibit 5 to Shi's deposition, submitted with Defendants' motion for summary judgment and authenticated in that deposition.  (Doc. 103-1 at 53 (207-08); doc. 103-5 at 31-37).  This objection is **OVERRULED**.

against the individual defendants.  (*Id.* at 16-20, 23).  All other claims remained pending.  (*Id.* at 23-24).

Those remaining claims are as follows:

Claim 1:  Substantive Due Process claim under § 1983[11] against Montgomery in his individual capacity for placing Plaintiff on administrative leave with pay between August 25 and December 31, 2011;

Claim 2:  Substantive Due Process claim under § 1983 and Title VII claim against Montgomery in his individual capacity for appointing Dr. Venkata Atluri as the Interim Chair of the University's Department in the winter of 2010;

Claim 4:  Substantive Due Process claim under § 1983 and Title VII claim against Wims in his individual capacity for not renewing Plaintiff's employment with the University in December 2011;

Claim 5:  Substantive Due Process claim under § 1983 against Wims and Hugine in their individual capacities for reorganizing all of the University's schools and departments in 2011 and allegedly not allowing any discussions among lower level administrators and/or faculty about it; and

Claim 6:  (i) Title VII count against the Board; and (ii) § 1983 and Title VII counts against Montgomery, Wims and Hugine in their individual capacities.  Claim 6 simply reasserted the conduct asserted in Claims 1, 2, 4 and 5, and contended the Board is responsible for it.

(Doc. 28 at 7-14 & 23); (*see also* doc. 7 at 4, 5, 7, & 11; doc. 21 at 1-2).  Both sides have moved for summary judgment in their favor on all remaining claims.  (Doc. 101 at 5; doc. 109 at 1).  Shi was given notice of his right and obligation to respond to Defendant's motion for summary judgment.  (Docs. 107 & 107-1).  Both sides filed oppositions and replies to the other's motions and responses.  (Doc. 111, 112, 114, & 117).

---

[11] Shi asserts this claim also includes a Title VII claim, (doc. 111 at 3); however, the amended complaint only lists § 1983 as the legal basis for this claim, (doc. 7 at 4).  Regardless, Claim 6 includes Title VII claims against Montgomery for this conduct, (doc. 21 at 1-2), and Defendants address this factual basis in their analysis of the Title VII claims, (doc. 102 at 18-25).  The Court does the same below.

### III. Analysis

#### A. Title VII Claims

Title VII prohibits employers from "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's race . . . or national origin . . . ." 42 U.S.C. § 2000e-2(a)(1). "A plaintiff may prove a claim of intentional discrimination through direct evidence, circumstantial evidence, or through statistical proof." *Rioux v. City of Atlanta, Ga.*, 520 F.3d 1269, 1274 (11th Cir. 2008). Where, as here, a plaintiff offers only circumstantial evidence, the court evaluates the sufficiency of his claims through the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05 (1973).

Under this framework, the plaintiff bears the initial burden of establishing a *prima facie* case. *Id.* at 802. To do so, he must show: (1) he was a member of a protected class, (2) who was qualified for his position, but (3) was subject to an adverse employment action and (4) treated less favorably than a similarly situated employee outside of his protected class. *Burke-Fowler v. Orange Cnty., Fla*, 447 F.3d 1319, 1323 (11th Cir. 2006). "The successful assertion of a *prima facie* case then creates a rebuttable presumption that the employer unlawfully discriminated against the plaintiff." *Rioux*, 520 F.3d at 1275. (internal quotation marks and citations omitted).

Once the plaintiff establishes a *prima facie* case, the burden then shifts to the employer to produce evidence that it had a legitimate, non-discriminatory reason for the challenged action. *Rioux*, 520 F.3d at 1275. If the employer satisfies its burden, the burden shifts back to the plaintiff to "show that the proffered reason really is a pretext for unlawful discrimination." *Id.* (internal quotation marks and citations omitted).

### 1. Claims Against Individual Defendants

First, to the extent Shi asserts Title VII claims against Defendants Montgomery, Wims, and Hugine in their individual capacities, those claims are due to be dismissed.   "[I]ndividual employees are not subject to liability under . . . Title VII . . . ."   *See Fodor v. D'Isernia*, 506 F. App'x 965, 966 (11th Cir. 2013) (citing *Dearth v. Collins*, 441 F.3d 931, 933 (11th Cir. 2006)); *accord Shuler v. Bd. of Trustees of Univ. of Alabama*, 480 F. App'x 540, 544 (11th Cir. 2012) (citing *Albra v. Advan, Inc.*, 490 F.3d 826, 830 (11th Cir. 2007)).   "[R]elief under Title VII is available against only the employer and not against individual employees whose actions would constitute a violation of the Act . . . ."   *Dearth*, 441 F.3d at 933.

Shi disputes this conclusion, citing a law review article for the proposition "[a] supervisor and employer will be joined in a lawsuit, liable both jointly and severally."   (Doc. 111 at 26) (quoting Kathryn K. Hensiak, *When the Boss Steps over the Line: Supervisor Liability Under Title VII*, 80 MARQ. L. REV. 645, 653 (1997)).   The article in question, however, is not discussing what the law is in the Eleventh Circuit, *see* Hensiak, *supra.*, at 649 n.23 (listing the Eleventh Circuit as falling into the category of "courts reject[ing] supervisor liability under Title VII"); instead, it is describing a split among the circuits and arguing in favor of an interpretation of Title VII that holds individual employees jointly liable with their employers under common-law agency principles, s*ee id.* at 654 & 666.

Shi also asserts that, if it is true individual-capacity Title VII claims do not exist, Defendants should have raised it earlier.[12]   (Doc. 111 at 26).   Shi cites no authority for the

---

[12] Defendants moved to dismiss Shi's complaint on June 3, 2013, but raised only Eleventh Amendment Immunity, pleading-standard, and improper-party defenses in their motion to dismiss. (*See* doc. 15).   Upon considering those grounds, the judge previously assigned to this case dismissed the claims against the University, against the Grievance Committee, and against the individual defendants in their official capacities on Eleventh Amendment Immunity grounds.

proposition a defense asserting the plaintiff has failed to state a claim upon which relief may be granted is waived if it is not raised in a pre-discovery motion to dismiss. Such defenses are, in fact, "expressly preserved against waiver [for failing to raise them in a Rule 12 motion or other responsive pleading]" by Rule 12(h)(2). FED. R. CIV. P. 12, Adv. Comm. Notes, "Subdivision (h)" (1966 Amendments).

Shi has presented no basis to override the Eleventh Circuit's clear ruling that Title VII claims do not exist against individual employees committing the conduct violating the statute. *See Dearth*, 441 F.3d at 933. As a result, Montgomery, Wims and Hugine are entitled to summary judgment on his Title VII claims against them, and those portions of claims 2, 4, and 6 are **DISMISSED**.

### 2. Claims Against the Board

That leaves only the Title VII claims against Shi's employer, the Board of Trustees of the University. He asserts Title VII claims against the Board based on allegations that (a) Montgomery removed his name from a list of proposed tenure-track appointments in 2007;[13] (b) Montgomery appointed Atluri as the Interim Chair of DCS in 2010; (c) Montgomery placed Shi on administrative leave with pay in August 2011; and (d) Wims did not renew Shi's employment with the University in December 2011. (Doc. 21 at 1-2). Shi has not established a disputed question of material fact on any of these bases.

---

(Doc. 28).

[13] It is not entirely clear from Shi's Amended Complaint that this was a separate asserted basis for Title VII relief against the Board, (*see* doc. 7 at 9 (stating this allegation against Montgomery among a series of free-floating allegations following Claim 4 against Wims); doc. 21 at 1-2 (failing to include this among the re-alleged conduct of the various individuals)); however, construing Shi's pleadings broadly, the Court will follow Defendants' lead and address it as a separate alleged basis for Title VII relief, (*see* doc. 102 at 19). (*See also* doc. 21 at 2) (seemingly alleging the Board is responsible for all of the violations the individual defendants allegedly committed).

### i.  Failure to Exhaust Administrative Remedies

First, as a threshold issue, Shi did not timely exhaust his administrative remedies on three of the four bases:  the tenure-track-appointment-list allegations, the Interim-Chair-appointment allegations, and the administrative-leave allegations.   Under Title VII, "[i]f the victim of an employer's unlawful employment practice does not file a timely complaint, the unlawful practice ceases to have legal significance, and the employer is entitled to treat the unlawful practice as if it were lawful."  *City of Hialeah, Fla. v. Rojas*, 311 F.3d 1096, 1102 (11th Cir. 2002).  In a non-deferral state, plaintiffs have 180 days in which to file charges of discrimination with the EEOC.  *See Ledbetter v. Goodyear Tire & Rubber Co.*, 421 F.3d 1169, 1178 (11th Cir. 2005), *superseded on other grounds by statute*, Lily Ledbetter Fair Pay Act of 2009, Pub. L. No. 111-2, § 3, 123 Stat. 5, 5-6.

Shi filed his EEOC charge on March 23, 2012.  (Doc. 1-1 at 12).  The 180-day statute of limitations period would, therefore, encompass any unlawful practice occurring between September 25, 2011, and March 23, 2012.  This would not include the tenure-track-appointment-list allegation in 2007, the Interim-Chair-appointment allegation in 2010, and the administrative-leave allegations in August 2011.[14]  Shi does not contend he filed his EEOC charge within 180 days of these events; instead, he argues the statute of limitations for filing an EEOC charge in Alabama is 300 days.  (Doc. 111 at 27).  Shi cites no authority for this statement, but, in any event, it is incorrect.  Alabama is a non-deferral state, in which a plaintiff must file his charge

---

[14] Although the administrative leave with pay continued up until Shi's employment ended on December 31, 2011, "the time for filing an EEOC charge begins to run when the employee receives unequivocal notice of the adverse employment decision."  *Grayson v. K Mart Corp.*, 79 F.3d 1086, 1100 n.19 (11th Cir. 1996).  Regarding the administrative leave, that would have been when he was notified of it in August 2011, more than 180 days from the date he filed his EEOC charge.  Regardless, even if the administrative leave were timely, the circumstances surrounding Shi being put on administrative leave and being let go are substantially the same, the latter of which is addressed below.

within 180 days of the adverse employment decision.  *See  Ledbetter*, 421 F.3d at 1178 ("For claims arising in so-called 'non-deferral' states, such as Alabama, to be timely, the applicable charge must have been filed within 180 days 'after the alleged unlawful employment practice occurred.'"); *Boyd v. Honda Mfg. of Alabama, LLC*, No. 1:08-CV-960-VEH, 2010 WL 6084741, at \*7 (N.D. Ala. Dec. 16, 2010).[15]  As a result, these three bases for his Title VII claim against the Board are time-barred, and the Board is entitled to judgment as a matter of law.

### ii.  Shi's Termination/Non-Renewal

Shi alleges he was terminated in December 2011 "for protesting [Wims's] appointment of [Montgomery] as the new dean of the newly re-organized college."  (Doc. 7 at 7).  First, this allegation does not state Shi's employment was ended because of his race or national origin.  Other than a brief, conclusory description of this action as "discrimination" and the citation to Title VII, there is no allegation that the basis for Shi being let go was his race or national origin, (*id.* at 7-10).  To the contrary, his allegations are he was let go as retaliation for "disclos[ing] the dean's wrongdoings and protest[ing] the Provost's appointment of Dr. Montgomery as the new dean (whose misdeeds are documented elsewhere)."  (*Id.* at 8).  This alone is enough to cause his claim to fail.  *See Blue v. Dunn Const. Co.*, 453 F. App'x 881, 886 (11th Cir. 2011) ("We do not analyze whether employment decisions are prudent or fair.  Instead, our sole concern is whether unlawful discriminatory animus motivates a challenged employment decision.")

Regardless, Shi has not established a *prima facie* case of discrimination.  To make a *prima facie* case of discriminatory discipline or termination, the plaintiff must show "(1) the plaintiff is a member of a protected class, (2) [he] was subjected to an adverse employment

---

[15]  *See also* EEOC's Birmingham District Office Timeliness Information, http://www.eeoc.gov/field/birmingham/timeliness.cfm ("In the State of Alabama, an individual has 180 days from the date of alleged harm to file a charge with this office . . . .").

action, (3) the employer treated similarly situated employees outside the class more favorably, and (4) [he] was qualified to do [his] job." *Brooks v. CSX Transp., Inc.*, 555 F. App'x 878, 883 (11th Cir. 2014) (citing *Maniccia v. Brown*, 171 F.3d 1364, 1368 (11th Cir. 1999)).  Defendants do not dispute Shi is a member of a protected class, was subjected to an adverse employment action, and was qualified to perform the job.  (*See* doc. 102 at 23) (challenging only his failure to proffer a similarly situated comparator).

Shi has attempted to show he was treated differently than a similarly situated employee outside his class by pointing to Jay Gangasoni.  (Doc. 111 at 14-15).  He contends his "employment was **terminated** solely due to the **claimed** but **never-can-be-convicted-as-wrong behavior** at the meeting on Mon 8/15/11, but Mr. Jay Gangasoni's employment was **retained** . . . ."  (*Id.* at 14).  He then states they were both non-tenure track and had never been convicted of any violation of "university, state and US federal regulations and/or statutes/laws, except for minor traffic violation," but Gangasoni is from India (where Shi is from China), has an MS degree in CS (where Shi has a Ph.D. in Applied Math with minors in CS), and held the "instructor" title in December 2010 (where Shi held the "associate professor" title).  (*Id.* at 15).

First, Shi does not cite to any evidence to support his allegations regarding Gangasoni.  (*See id.*; doc. 109 at 16-17).  Although Gangsoni is mentioned in the interrogatories attached to Shi's motion for summary judgment, those attachments include only questions and do not include any answers that could be considered as evidence.  (*See* doc. 109-5 at 15, 22, & 26).  Just as importantly, though, the allegations never assert Gangasoni ever committed the same actions for which Shi was allegedly let go.  (*See* doc. 11 at 15; doc. 109 at 16-17).  Even if Gangasoni were a proper comparator on other characteristics (which is doubtful considering the differences in qualifications Shi lists), if Gangasoni never committed the same conduct as Shi, he could not

have been more favorably treated in response.[16]

Finally, even assuming Shi could establish a *prima facie* case of discrimination, he does not show Defendants' proffered nondiscriminatory reason is just pretext for discrimination. "To avoid summary judgment the plaintiff must introduce significantly probative evidence showing that the asserted reason is merely a pretext for discrimination," but "[a] reason is not pretext for discrimination unless it is shown both that the reason was false, and that discrimination was the real reason." *Brooks v. Cnty. Comm'n of Jefferson Cnty., Ala.*, 446 F.3d 1160, 1163 (11th Cir. 2006).

Defendants assert Shi was put on administrative leave in August 2011 and ultimately not renewed at the end of that term because (1) he "consistently violated Procedure 5.1 by sending hundreds of unsolicited, annoying and harassing emails to Drs. Montgomery, Wims and Hugine and countless other faculty and administration members" and (2) Montgomery received complaints from faculty members "who felt threatened by [Shi]'s behavior at the August 15[, 2011] meeting." (Doc. 102 at 23-25). Shi responds by attacking the two reasons separately, stating that, because he had not been terminated by the end of the Summer 2011 semester, none of the emails before that time could have been a terminable offense, (doc. 111 at 17), and, therefore, the only reason he was let go had to be his conduct at the August 15, 2011 meeting, from which he was never convicted of any violation and must be presumed innocent, *id.* at 18-19.

First, that Shi was not let go at the end of the Summer 2011 term does not establish that

---

[16] Shi also mentions in his motion for summary judgment that "[a]t least five (5) other faculty members (all with national origins other than China) also questioned Montgomery on various issues while none of them but ***Plaintiff*** (who ***was never convicted violating*** [sic] ***any AAMU regulations***) was placed on 'Administrative Leave with Pay.'" (Doc. 109 at 11). He does not name these other faculty members, present any evidence to support his assertions, or establish these faculty members were similarly situated comparators.

his prior conduct did not, in conjunction with later conduct, play into the ultimate decision not to renew his contract at the end of the Fall 2011 semester.  Second, even if Shi's conduct at the August 15, 2011 meeting was the only basis for his non-renewal, that would be enough.  *See Crawford v. City of Fairburn, Ga.*, 482 F.3d 1305, 1309 (11th Cir. 2007) ("By failing to rebut *each* of the legitimate, nondiscriminatory reasons of the [defendant], [the plaintiff] has failed to raise a genuine issue of material fact about whether those reasons were pretext for discrimination." (emphasis added)).  Defendants submitted evidence Shi acted "in an aggressive and angry manner and made various disparaging remarks" about Montgomery at the August 15 meeting and Montgomery received complaints from faculty members who felt threatened by Shi's behavior, (doc. 103-9 at 6-7; doc. 103-12 at 5), which are legitimate, non-discriminatory reasons not to renew his contract at the end of the semester.

Shi states Defendants have not presented anything to show he has been "convicted" of a violation of the University's policies and he should, therefore, be entitled to the presumption of innocence.  However, the question is not whether Shi was "convicted" of violations or even whether he violated the University's policies at all; the question at issue here is whether Montgomery and Wims did not renew Shi's contract because he is from China.  *See Foster v. Biolife Plasma Servs., LP*, 566 F. App'x 808, 811 (11th Cir. 2014) ("A plaintiff cannot show pretext merely by showing that an employer's good faith belief that she engaged in misconduct is mistaken.") (citing *EEOC v. Total Sys. Servs., Inc.*, 221 F.3d 1171, 1176–77 (11th Cir. 2000)); *Blue*, 453 F. App'x at 886 ("[O]ur sole concern is whether unlawful discriminatory animus motivates a challenged employment decision.").  The Board says the reason Shi was let go was because Montgomery and Wims believed Shi's conduct (which they describe as sending repeated emails violating Procedure 5.1 and acting aggressively at the meeting) "fail[ed] to meet the

requirements of faculty conduct," (doc. 109-1 at 17-18), and Shi's race and national origin were never considered, (doc. 103-9 at 7; doc. 103-12 at 5).   Shi does not present any evidence to suggest Defendants' asserted reasons were not the real reasons he was put on administrative leave and ultimately let go.

Accordingly, the Board is entitled to judgment as a matter of law on Shi's claim of discriminatory termination/non-renewal under Title VII.   Because the Board is entitled to judgment as a matter of law on all of Shi's Title VII claims, those claims are **DISMISSED**.

**B.  § 1983 Claims**

Title 42 U.S.C. § 1983 authorizes private parties to enforce federal constitutional rights (and some federal statutory rights) against defendants who act under color of state law.   Section 1983 states as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia [i.e., law], subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

42 U.S.C. § 1983.   Notably, § 1983 does not itself create or establish any federally protected right.   *Doe v. Sch. Bd. of Broward Cnty., Fla.*, 604 F.3d 1248, 1265 (11th Cir. 2010).   Instead, it creates a cause of action for a plaintiff to enforce federal rights created elsewhere, such as constitutional rights.   *Id.*   To assert a cause of action based on § 1983, a plaintiff must establish two elements: (1) a violation of a constitutional right, and (2) that the alleged violation was

committed by a person acting under color of law.  *Holmes v. Crosby*, 418 F.3d 1256, 1258 (11th Cir. 2005).

Shi's amended complaint makes a series of substantive-due-process claims against Montgomery and Wims based on the same facts as his Title VII claims, plus a substantive-due-process claim against Wims and Hugine for reorganizing the University without considering employee opinion.  (Doc. 7 at 4-11; doc. 21 at 1-2).  However, he does not establish a dispute of material fact as to any violations of a constitutional right on any of these claims.

### 1.  Substantive Due Process – State-Created Interests

The substantive component of the Due Process Clause protects "fundamental" rights that are "implicit in the concept of ordered liberty."  *Kentner v. City of Sanibel*, 750 F.3d 1274, 1279 (11th Cir. 2014) (quoting *McKinney v. Pate*, 20 F.3d 1550, 1556 (11th Cir. 1994) (en banc)).  As fundamental rights are created by the Constitution, they do not include property interests created "by existing rules or understandings that stem from an independent source such as state law."  *Id.* A plaintiff's right to employment is not "so fundamental that our democratic society and its inherent freedoms would be lost if that right were to be violated."  *McKinney*, 20 F.3d at 1561. By extension, if a right to employment does not give rise to substantive due process rights, the lesser interest in a potential promotion also would not.  Similarly, this Court cannot say a faculty member's interest in being consulted before reorganization of a university is fundamental to a democratic society.  As a result, Shi's substantive due process claims fail because these rights do not implicate substantive due process concerns.[17]

_____

[17] There is an exception to this general rule:  "Where a person's state-created rights are infringed by a 'legislative act,' the substantive component of the Due Process Clause generally protects that person from arbitrary and irrational governmental action."  *Kentner*, 750 F.3d at 1279-80.  However, that exception is not applicable here because employment terminations are executive acts, not legislative ones, *id.* at 1280, as is reorganization of the University, which,

### 2.  Procedural Due Process

State-created property rights, such as those represented by an employment contract, are protected, instead, under the procedural component of the Due Process Clause and "constitutionally may be rescinded so long as the elements of procedural—not substantive—due process are observed." *McKinney*, 20 F.3d at 1556.  Regardless, a constitutionally protected interest must exist. *See Gray v. Bd. of Regents of Univ. Sys. of Georgia*, 150 F.3d 1347, 1350 (11th Cir. 1998) ("The success of due process arguments depends upon the finding of a constitutionally protected property interest in the expectation of continued employment or of a liberty interest having been infringed upon by the State; absent such interest, no due process protections attach.").

None of the state property interests Shi asserts are entitled to any particular process:  (1) not when being put on administrative leave with pay, *cf. Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 545 (1985) (noting in dicta that, where employees have a property right in their employment (such as tenure), putting an employee perceived as threatening on administrative leave with pay would *avoid* a due-process-violating termination until sufficient process could be provided)[18]; (2) not when being terminated/non-renewed, *see Gray*, 150 F.3d at 1352-53 ("[The plaintiff] never had tenure (and therefore no property right entitled to protection under the Fourteenth Amendment)."); and (3) not when being passed over for appointment to a higher position, *see Wu v. Thomas*, 847 F.2d 1480, 1485 (11th Cir. 1988) ("[A] prospective promotion

under state law, is an executive power explicitly given to the President of the University, *see* Ala. Code § 16-49-23 ("The president may regulate, alter, and modify the organization of the university, subject to review and concurrence of the board.").

[18]As he is not tenured, Shi does not have such a protectable interest in his employment and can be terminated without any degree of process.  *See Gray*, 150 F.3d at 1352-53.  It would be illogical then to say he has a protectable interest in being provided process for the lesser sanction of being paid to not do the job he does not have an interest in performing.

is not a property or liberty interest protected by the fourteenth amendment.").  As noted above, Shi has no right to be consulted about the University's reorganization, *see* Ala. Code § 16-49-23, so he has no right to process before being deprived of it.  To the extent Shi's complaint can be construed to assert a procedural due process claim, it is **DISMISSED**.

### 3.   Substantive Due Process – First Amendment Retaliatory Discharge

Lastly, although he does not explicitly refer to it as such, Shi brings a First Amendment retaliatory discharge claim against Wims under § 1983.  (*See* doc. 7 at 7 ("That decision [to terminate Shi's employment] was an act of . . . retaliation against me for protesting [Wims's] appointment of [Montgomery] as the new dean . . . .")); doc. 109 at 22 ("The Constitution does not prohibit firing public employees, but *it does prohibit firing them* . . . *in retaliation for protected speech*."); doc. 111 at 10 ("[M]aking the foregoing statements and questioning Montgomery a couple of issues . . . is *protected by US constitution*, under the free speech laws.") & 19 ("Questioning a dean's *power abusing* and *lying*, before near 100 colleagues, is *not prohibited but protected* by US constitution.")).  Unlike with his discriminatory discharge claim asserting state-law employment rights, the substantive component of the Due Process Clause incorporates against the states the fundamental rights protected by the First Amendment and will support a claim of discharge in retaliation for protected speech.  *See Beckwith v. City of Daytona Beach Shores, Fla.*, 58 F.3d 1554, 1562 (11th Cir. 1995) (holding on this basis that *McKinney* did not prevent First Amendment retaliatory discharge claims).

"It is axiomatic that a state may not demote or discharge a public employee in retaliation for *protected* speech."  *Tindal v. Montgomery Cnty. Comm'n*, 32 F.3d 1535, 1539 (11th Cir. 1994) (internal quotation marks omitted).  To analyze a First Amendment retaliatory discharge claim requires four steps:  first, the court must determine whether the plaintiff's speech "may be

fairly characterized as constituting speech on a matter of public concern"; second, if the speech addresses a public concern, the court must weigh the plaintiff's First Amendment interest against "the interest of the state, as an employer, in promoting the efficiency of the public services it performs through its employees"; third, if the plaintiff prevails on the balancing test, the fact-finder must determine whether the plaintiff's speech played a "substantial part" in the government's decision to discharge him; and, lastly, if the employee shows his speech was a substantial motivating factor, the state must prove by a preponderance of the evidence "its legitimate reason, standing alone, would have induced it to make the same decision." *Bryson v. City of Waycross*, 888 F.2d 1562, 1565-66 (11th Cir. 1989).  Assuming Shi could establish his speech was made as a citizen (instead of an employee dissatisfied with a supervisor's decisions regarding the employee and his department), Shi has not established his First Amendment interests outweigh the interests of the Defendants' interests as Shi's employer.

This second step of the analysis, balancing the state's interest in efficient provision of public services against the plaintiff's speech interest, is referred to as the *Pickering* balancing test, *see id.* at 1565, and, along with the first step, is a "question[] of law designed to determine whether the employee's speech is protected by the First Amendment," *Beckwith*, 58 F.3d at 1564.  The Eleventh Circuit has noted three specific factors to consider in the analysis:  "(1) whether the speech at issue impedes the government's ability to perform its duties efficiently, (2) the manner, time and place of the speech, and (3) the context within which the speech was made." *Bryson*, 888 F.2d at 1565.  Specifically regarding statements by employees about their superiors, the court has held "'[t]he First Amendment does not require a public employer to tolerate an embarrassing, vulgar, vituperative, ad hominem attack,' even if such an attack touches on a matter of public concern.  If the manner and content of an employee's speech is

'disrespectful, demeaning, rude, and insulting,' and is perceived that way in the workplace, the government employer is within its discretion to take disciplinary action." *Mitchell v. Hillsborough Cnty.*, 468 F.3d 1276, 1288 (11th Cir. 2006) (quoting *Morris v. Crow*, 117 F.3d 449, 458 (11th Cir. 1997)).

Even assuming Shi's speech touched on an issue of public concern, the evidence shows Shi's speech was consistently embarrassing, vituperative, and *ad hominem*, and certainly disrespectful and insulting.  Emails Shi sent throughout 2011 to Defendants and other faculty referred to Montgomery as power-abusing, anti-democratic, and a dictator, specifically comparing him to Muammar Gaddafi and Hosni Mubarak.  (Doc. 103-5 at 11-13 & 23-25; doc. 103-9 at 6; doc. 103-12 at 5).  At the August 15, 2011 meeting, Shi called for Montgomery's resignation "in an aggressive and angry manner," (doc. 103-9 at 6), and called him a liar, a power-abuser, and bad at his job in front of other University faculty members, (doc. 102 at 14 (citing doc. 100 at 5); doc. 103-8 at 2; doc. 109 at 11).  Shi's behavior at the meeting resulted in complaints from other faculty members who felt threatened and had concerns for Montgomery's safety.  (*Id.*).  Furthermore, Shi's emails made it clear this behavior would not end short of him being fired or getting his way.  (Doc. 103-5 at 15) ("I will keep fighting until either I will be removed from AAMU or the dean will be removed from his position.").

"[P]ublic employers do not have to wait for actual disruption or internal damage to take place . . . ," *Mitchell*, 468 F.3d at 1289 (citing *Connick*, 461 U.S. at 152), and the courts will not question the government employer's reasonable determination that conduct will cause future disruption.  *See Waters v. Churchill*, 511 U.S. 661, 673 (1994) ("[W]e have given substantial weight to government employers' reasonable predictions of disruption, even when the speech involved is on a matter of public concern, and even though when the government is acting as

sovereign our review of legislative predictions of harm is considerably less deferential."); *Mitchell*, 468 F.3d at 1289 & n.31 (finding the government's determination reasonable and declining to question that decision). Shi's behavior was already affecting other faculty members' state of mind, and the continuation of the behavior could have easily "cause[d] serious disciplinary problems, undermine[d] employee morale, and impair[ed] harmony among co-workers." *Morris*, 117 F.3d at 458. Defendants were well within their rights to take disciplinary action in response to Shi's conduct.

Shi asserts the fact he was not put on administrative leave or terminated before August 2011 shows he was not terminated because of the emails and they should not be considered. (*See* doc. 111 at 15-19). However, as noted earlier, the fact he was not put on leave or immediately terminated after any particular email does not mean the threat of continuing those emails, in conjunction with reports of the effect Shi's conduct was having on other faculty, did not combine to result in his being put on leave and ultimately let go. In fact, this tends to work against his argument he was fired because of the speech itself as opposed to the effect the manner of his speech was having on the workplace. At times throughout the spring of 2011, Montgomery responded to Shi's emails by stating he needed to use the proper protocols and chain of command and stop sending emails to the faculty mischaracterizing things Montgomery had done. (Doc. 103-5 at 21 & 28-29). The evidence indicates it was not until Shi confronted Montgomery personally in front of other faculty, who expressed distress from Shi's conduct, that Defendants decided to take disciplinary action against him.

Because Shi has not established disputed facts to support a finding his speech interest outweighs Defendants' interest in maintaining efficient workplace operation, Defendants are entitled to judgment as a matter of law on his First Amendment retaliatory discharge claim and

that claim is **DISMISSED**.

## IV. Conclusion

Based on the foregoing, it is **ORDERED:**

1. Defendants' first motion to strike, (doc. 104), is **DENIED as MOOT.**

2. Defendants' second motion to strike, (doc. 115), is construed as objections to Shi's evidentiary submissions and **SUSTAINED IN PART** and **OVERRULED IN PART**. Specifically, Defendants' objections to Shi's conclusory, unsupported and hearsay statements of fact are **SUSTAINED**; Defendants' objection to the emails attached to Shi's motion for summary judgment as unauthenticated is **OVERRULED**; and Defendants' remaining objections are **MOOT**.

3. Defendants' motion for summary judgment, (doc. 101), is **GRANTED** and Shi's motion for summary judgment, (doc. 109), is **DENIED**. All of Shi's claims against the Defendants are, therefore, **DISMISSED**. A separate order will be entered.

DONE this the 28th day of September 2015.

**JOHN H. ENGLAND, III**
UNITED STATES MAGISTRATE JUDGE